**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

MARS, INCORPORATED,

               Plaintiff,

    v.

FACTORY MUTUAL INSURANCE
COMPANY, d/b/a FM GLOBAL,

               Defendant.

Civil Action No. _____

## COMPLAINT

    Plaintiff Mars, Incorporated ("Mars") alleges the following against defendant Factory

Mutual Insurance Company ("FM"):

## NATURE OF THE ACTION

    1.    Mars seeks rulings on factual questions, scientific issues, and questions of insurance

contract interpretation from the Court so that it can obtain bargained-for insurance recoveries under

an all-risks commercial property insurance policy issued to Mars by FM (the "Policy") for losses

suffered due to physical loss and damage to property in 2020.  The Policy was issued for the

January 1, 2020 to January 1, 2021 policy period, and is attached as Exhibit 1.  FM disputes the

factual and legal predicates necessary for Mars to obtain the recoveries to which it is owed.  Actual

controversies therefore exist between the parties, making declaratory relief necessary to resolve

their disputes.

    2.    Mars is a global manufacturer of confectionery, pet foods, and other food products,

and is also a leading provider of animal care services.  Mars has some of the best-known (and

loved) brands in the world: M&M's, Snickers, Twix, Milky Way, Skittles, and Ben's Original.

Mars is not just synonymous with food; it has brought its science-powered business to pet care,

creating products and services that pets, too, love: brands like Pedigree, Royal Canin, and Whiskas, and pet-health services through Banfield Pet Hospital and VCA, Inc., among others.  It employs more than 130,000 people in more than thirty countries.

3.     Mars' operations suffered substantial losses in 2020 following site closures resulting from the COVID-19 pandemic. Multiple employees reported that they were working at a Mars location covered by the Policy when infected with COVID-19.

4.     In addition to confirmed actual cases of COVID-19 on Mars' premises, and the high percentage of asymptomatic cases of COVID-19, it is statistically certain that the actual number of individuals present at Mars' insured locations, and at applicable third-party property, who contracted COVID-19 was substantially greater than the number of individuals that reported COVID-19 to the company.

5.     In addition to confirmed actual cases of COVID-19 on Mars' premises, general statistical modeling confirms to a high degree of certainty that COVID-19 was present in or around commercial and industrial properties generally.[1]  It is statistically and scientifically certain that COVID-19 was being continuously introduced, dispersed, and reintroduced into and altering the air and on surfaces of property in or around Mars' locations, including at businesses and amenities

---

[1] *See, e.g.*, Expert Report of Joseph Lewnard as filed in *Treasure Island, LLC v. Affiliated FM Insurance Co.* ("*Treasure Island*"), No. 20-00965, ECF No. 205-3 at 126-128 (D. N.V.), attached as Exhibit 2; *COVID-19 Event Risk Assessment Planning Tool,* Georgia Institute of Technology. https://covid19risk.biosci.gatech.edu; *Covid-19 Projections*, IHME https://covid19.healthdata.org/united-states-of-america?view=total-deaths&tab=trend; *Covid-19 Risk Mapping*, Columbia University, https://columbia.maps.arcgis.com/apps/webappviewer/index.html?id=ade6ba85450c4325a12a5b9c09ba796c; *Covid-19 Modeling*, NORTHEASTERN UNIVERSITY, https://covid19.gleamproject.org; *LANL Covid-19 Cases and Deaths Forecasts*, LOS ALAMOS NATIONAL LABORATORY, https://covid-19.bsvgateway.org.

in the vicinity of Mars' locations.  It is also statistically and scientifically certain that COVID-19 altered the air and surfaces at and around Mars' locations.

6.      As a result of physical loss or damage to its property and risks of physical loss or damage to its property, Mars suffered loss of earnings and business income and incurred covered "extra expense" including without limitation the cost of personal protective equipment (*e.g.,* masks, shields, gloves), physical modifications to stores and other locations (*e.g.*, the installation of shields, printed collateral, window clings, and social distancing items), the costs of disinfectants, extra cleaning services and sanitation products, logistics extra costs to address the disruption of the normal movement of goods and materials (including such things as the purchase of additional back stock bins and stations to hold quarantined product) and additional security costs.

7.      Mars purchased the Policy to obtain broad multi-risk protection for the risk of loss it might incur due to various causes of loss or damage to property.

8.      The FM "all-risk" policies are among the "best-in-class" of the "all-risk" property coverage available on the commercial insurance market.  They contain, for example, affirmative grants of coverage for communicable disease.  They do not contain what other insurers call a "virus" exclusion, but instead contain only a "contamination" exclusion that excludes coverage for "contamination, and any cost due to contamination."  Among other things, Mars does not seek recovery from FM for "contamination" or "any cost due to contamination."  The communicable disease of COVID-19 is not a "contaminant" as the term is defined in the Policy.  And, as noted above, communicable disease is expressly covered as "physical loss or damage" under the Policy. This differentiates the Policy from the insurance policies involved in most insurance coverage litigation matters concerning COVID-19.

3

9.      FM disputes that the Policy covers Mars' claims for losses resulting from physical loss or damage.  It contends in coverage litigation throughout the United States that COVID-19 lost income coverage is limited to small "sub-limits", that the presence of SARS-CoV-2 or COVID-19 is not "physical loss or damage" to property, and that coverage is otherwise barred by the "contamination" and loss of use or loss of market exclusions.  Actual controversies exist between the parties concerning the extent to which Mars is entitled to recover under the Policy for its COVID-19 losses.

## THE PARTIES

10.     Mars is a Delaware corporation with a principal place of business in McLean, Virginia.

11.     FM is a Rhode Island corporation with a principal place of business in Johnston, Rhode Island.

## JURISDICTION AND VENUE

12.     Jurisdiction over FM is based on diversity of citizenship under 28 U.S.C. § 1332(a)(1) in that the matter in controversy exceeds the sum of $75,000 and the matter is between "citizens of different States."

13.     Personal jurisdiction over FM exists because it has sufficient minimum contacts with Virginia. FM currently conducts business in this judicial district and has done so for many years.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as events giving rise to Mars' claim took place in this district where Mars has its principal place of business.

15.     Actual controversies exist between the parties as to the predicate facts necessary for Mars to obtain what it believes to be the full amount of coverage owed under the Policy for its COVID-19-related losses.

## THE FM POLICY

16.     FM is a large international property insurer.  It expends substantial resources on analyzing risks, including those that may in the future cause loss to its policyholders and deciding which risks it intends to cover or avoid.  FM has issued property insurance coverage to Mars for decades. It is extremely knowledgeable about the nature and scope of Mars' business and the nature of the risks against which it was insuring.

17.     FM is part of the FM Global group of insurance companies.  FM Global says its approach to claims is different from other insuring organizations: "[y]ou'll discover that our approach to claims is different, too.  We work closely with you *before, during* and *after* a loss— no matter where in the world that loss occurs.  And we ground our recommendations in world-class scientific research and on-the-ground engineering services."[2]

18.     FM introduced its standard property policy form long ago.  As shown in its various regulatory filings with state insurance departments, FM modified its standard form from time to time, typically with enhancements to coverage, but sometimes simply to clarify the coverage.  The modifications over time have not restricted coverage.

### *The Broad Coverage the Policy Grants for All Risks of Physical Loss or Damage to Property*

19.     The Policy is fundamentally different than most commercial property insurance policies because it expressly covers physical loss or damage by a communicable disease, putting to rest FM's position that a communicable disease is not a risk, cause, or type of physical loss or

---

[2] https://www.fmglobal.com/about-us/why-fm-global (emphasis original).

damage covered by the Policy.  The Policy provides insurance for property loss and business interruption loss resulting from all risks of physical loss or damage to covered property.  The Policy "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy."  Ex. 1 at 1.

20.     The Policy's coverage extends to losses resulting from the "risks of" physical "loss" or "damage" to Mars' property, and, in some instances, to third-party property within designated distances, and applies regardless of whether Mars' property, or third-party property, suffered any alteration to its physical structure.

21.     The Policy's coverage encompasses circumstances where Mars' use of its property is limited, restricted, or prohibited to prevent the spread of communicable disease and resulting loss or damage to property.

22.     The Policy also covers Mars for business interruption losses where access to a covered Mars' location is prohibited by an order of a civil authority issued in response to physical loss or damage to third-party property within five miles of a covered Mars' location.

23.     The Policy covers Mars' losses because ingress to or egress from covered locations is physically prevented, either partially or totally, because of physical loss or damage to property "whether or not the premises or property of the Insured is damaged."

24.     In the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "physical damage."

25.     The Policy does not define "physical."

26.     The Policy does not define "loss."

27.     The Policy does not define "physical loss."

28.     The Policy does not define "damage."

6

29.     The Policy does not define "physical damage."

30.     The Policy does not define the phrase "physical loss or damage."

31.     The Policy does not define the terms "risks" or "risks of."

32.     The Policy does not define the phrase "risks of physical loss or damage."

33.     When undefined, the "physical loss or damage" and "risks of physical loss or damage" phrases are susceptible to more than one reasonable interpretation under the circumstances of this action.

34.     When the undefined phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation, they should be construed against the drafter – FM.

35.     Dictionary definitions of "loss" include:

   a.  "[T]he harm or privation resulting from losing or being separated from someone or something." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

   b.  "[D]ecrease in amount, magnitude, value, or degree." *Id.*

   c.  "[T]he fact that you no longer have something or have less of something." Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

   d.  "[H]aving less than before." Loss, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/loss

   e.  "[T]he state of no longer having something or as much of something[.]" Loss, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=loss

36.     At the very least, Mars has incurred "loss" "from losing," from a "decrease," or from "having less" of its covered property due to COVID-19 and/or the Pandemic.

37.     Courts have long held that the presence of a dangerous invisible substance at or on property, including within its airspace, constitutes "physical loss or damage" to property.  Many courts also hold that the restriction of use of property due to an imminent risk of danger to its inhabitants constitutes "physical loss" to property.[3]  FM adopted this position prior to the COVID-19 pandemic.

38.     For example, on November 19, 2019, FM filed a brief in a dispute with another property insurer asserting that "[n]umerous courts have concluded that loss of functionality or reliability . . . constitutes physical loss or damage," regardless of whether the property also suffered tangible, structural alteration.  Exhibit 4 at 3.  FM's argument was neither novel nor aggressive. "[N]umerous courts," in fact, issued the rulings FM ascribed to them.  The scope of potentially covered losses resulting from the Pandemic caused FM to change its position to attempt to minimize its coverage obligations.

39.     Sixty years ago, an appellate court rejected an insurer's attempt to construe its property policy as requiring "tangible injury to the physical structure" for coverage potentially to exist.  Per the court: "Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner."  *Hughes v. Potomac Ins. Co.*, 199 Cal. App. 2d 239, 248 (1962).

40.     More recently, in *Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.*, -- a pre-Pandemic case in which FM's sister company, Affiliated FM Insurance Company ("AFM"), was a party and that was decided on summary judgment -- the court acknowledged that "physical loss or damage" under a property policy can be established where

---

[3] *See, e.g.*, Richard P. Lewis, Lorelie S. Masters, Scott D. Greenspan & Chris Kozak, *Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences*, 56 Tort & Ins. L. J. 621 (Fall, 2021), attached hereto as Exhibit 3.

8

the imminent release of an invisible substance into the airspace of a covered property presents a significant enough health hazard to people occupying the premises that it impairs the building's function, utility, or habitability.  311 F.3d 226, 235 (3d Cir. 2002).

41.     Despite "common sense," FM chose *not* to define the phrase "physical loss or damage" or otherwise state that the phrase means that coverage is dependent on proof of "tangible injury" to a physical structure.  The entire insurance industry has done this for decades.  One federal court, in a COVID-19 coverage case, thus commented: "[c]arriers have utilized the phrase *direct physical loss* for over fifty (50) years and courts have begged carriers to define the phrase to avoid the precise issue before the Court now."  *Cherokee Nation v. Lexington Ins. Co*., 2021 WL 506271, at *3-6 (Okla. Dist. Ct. Jan. 28, 2021) (emphasis original), attached as Exhibit 5; *see also Snoqualmie Entertainment Authority v. Affiliated FM Ins. Co*., 2021 WL 4098938, at *5 (Wash. Super. Sep. 03, 2021) (finding one reasonable interpretation of the term "physical loss" was the inability to maintain a presence on the property).

### FM Has Made Numerous Statements Concerning "Communicable Disease" that Contradict its Current Reading

42.     For more than a decade, FM and AFM made public admissions regarding the so-called communicable disease coverages in their policies.  They repeatedly represented to state regulators that the presence of and spread of communicable disease at property is considered "direct physical damage" under their policies' coverage grants for communicable disease.  These statements are not "extrinsic" evidence of intent nor are they "parol evidence."  They are statements by the drafters of the Policy as to how their policies apply, and the considerations upon which certain provisions in the Policy were based.  These admissions refute the contrary positions FM has taken in numerous lawsuits pending across the United States.

43.     In or about 2010, FM submitted Form FMG7446, an endorsement for "Communicable Disease Cleanup, Removal and Disposal," to state insurance regulators. FMG7446 states that, "[f]or the purpose of this Additional Coverage, the presence of and spread of communicable disease *will be considered direct physical damage* and the expenses listed above *will be considered expenses to repair such damage."* Exhibit 6 (emphasis added).

44.     AFM's 2015 regulatory filings concerning coverages for "Communicable Disease Cleanup, Removal And Disposal" and "Interruption by Communicable Disease" repeated that statement admitting that "[f]or the purpose of this coverage [or extension], the presence [of] and [the] spread of communicable disease will be considered direct physical damage" and the expenses "will be considered expenses to repair such damage." *Id*. Exhibit 7 at 1-2.

45.     FM and AFM revised their property policies in 2016 for grammatical and structural reasons.   FM did not include any new and pertinent coverage limitations but did include "expansions" of coverage, including with respect to the Communicable Disease Coverages.

46.     In securing approval of the 2016 version of its Global Advantage policy form, FM stated the following regarding the coverages under its prior policy form FMG7446:

> This ["Communicable Disease Response"] endorsement was previously approved in filing FMIC-2011-13 as Communicable Disease Cleanup, Removal and Disposal Endorsement. The replaced Endorsement was previously available to insureds with healthcare occupancies only.   Grammatical and editorial changes have been made to remove the **healthcare facility** terms because this coverage is now offered as optional to all clients.  The coverage also now allows for an officer of the Insured to trigger the coverage. *This is an expansion in coverage.*

Exhibit 8 at 6 (boldface in original, italics added for emphasis)*; see also id.* at 9 ("FMG7450: Interruption by Communicable Disease Endorsement").

47.     AFM's 2016 filings with respect to its standard policy form substantially repeat the statements made above concerning the Policy and note that the Communicable Disease Coverages now provide "core coverage" to insureds.  Exhibit 9 at 2, 4.  As "core" coverages, they are not "exceptions" to exclusions that otherwise preclude coverage.

48.     FM's explanatory memorandum for the 2019 update states that coverage for "Interruption By Communicable Disease" had only received an "[e]ditorial clarification.  There is no material change in coverage."  Exhibit 10 at 4; Exhibit 11 (redlined version of "Interruption By Communicable Disease" coverage).

49.     As attested to by expert David L. Stegall in the case *Cinemark Holdings, Inc. et al. v. Factory Mutual Ins. Co.,* No. 4:21-cv-00011-ALM (E.D. Tex.), the FM Global insurers acknowledged for years that the presence of and spread of communicable disease at property *is* direct physical damage to property, regardless of their changes in position engendered by the Pandemic:

> As FM admits in this litigation, these two coverage "expansions" are not triggered by physical loss or damage to the property insured. This is a change from the Communicable Disease coverages that FM previously offered to healthcare clients. Those endorsements explained that "*the presence of and spread of communicable disease will be considered direct physical damage and the expenses listed above will be considered expenses to repair such damage*." In other words, FM understood that in some cases, as [the insured] has presented here, the presence of a Communicable Disease and its causative viral agent can cause loss or damage to property and that the repair and remediation efforts should be considered repair costs. FM represented to regulators that its decision to remove this phrase in 2016 was a "grammatical and editorial change[ ]" to expand coverage.  Thus, FM never changed its position that "*the presence of and spread of communicable disease will be considered direct physical damage and the expenses listed above will be considered expenses to repair such damage*."

Exhibit 12 at 8 (emphasis original).

50.     Reinforcing these prior admissions, at the outset of the COVID-19 pandemic, FM issued an internal document called "Talking Points on the 2019 Novel Coronavirus (2019-nCov)." Exhibit 13 (the "Talking Points").   Among other things, the document states that the actual presence of communicable disease at property is a Property Damage "trigger of coverage."  *Id*. at 1.  The Talking Points close by acknowledging that the FM Global Advantage form, upon which the Policy is written, "offers some of the broadest property coverage available."  *Id*. at 2.

51.     The Talking Points also state – in an attempted effort at inoculation – that coverage extensions such as "Civil or Military Authority" coverage and "Supply Chain (ProVision)" do not "apply" because "[t]he presence of a communicable disease does not constitute physical damage" because a "virus" is an excluded "contaminant."  *Id*.  Those two statements are false and contrary to the prior admissions discussed above.

52.     FM stated repeatedly for years that "the presence of and spread of communicable disease *will be* considered direct physical damage."  The changes made in the coverages in the 2016 and 2019 iterations of the policy forms were either structural, grammatical or *expansive* in scope.  FM did not restrict or limit the so-called Communicable Disease Coverages since their introduction in or about 2011, nor did the assumptions upon which these coverages were based change over time.

53.     Most recently, in *Treasure Island LLC v. Affiliated FM Ins. Co.*, 2:20-cv-00965-JCM-EJY (D. Nev.), two pieces of evidence confirm that the internal conduct policies of AFM are contradictory to coverage denials and litigation positions.

54.     The first piece of evidence is an internal email from AFM's Operations Vice President & Senior General Adjuster, Jason Wing ("Mr. Wing") dated March 21, 2020, admitting that COVID-19 *can* cause physical loss or damage by quoting an internal loss code noting that

"physical loss or damage" "results from the actual presence of a communicable disease" at property:

> Physical loss or damage which results from the actual presence of a communicable disease and the associated business interruption as defined in the policy.[4]

55.     The second piece of evidence is a voicemail message from Brian Cook ("Mr. Cook"), AFM's Senior General Adjuster, to John Baker, another Senior General Adjuster, together with an email attaching the same. The voicemail message states in full:

> Hey John, this is Brian. Remember we had a discussion about changing the words that COVID-19 would not constitute physical loss or damage to something that gives us more wiggle room and I would recommend changing the 'would' to 'may not', but give me a call back and see where we are, alright? I got a denial order from Paz and I made that change in his letter and he was questioning it because he used exactly what's [sic] he believes is in the template and still in the template so I'm wondering are we going to change the template to be the softer language or not. So give me a call. Thanks.[5]

56.     Mr. Cook, in the voicemail, strategizes how AFM should publicly address COVID-19-related claims in its template response to policyholders.  Mr. Cook does not say that COVID-19 "would not" constitute physical loss or damage; rather, Mr. Cook advises that they should use words that give AFM "more wiggle room," and say that COVID-19 "may not" constitute physical loss or damage.   This evidence shows the ambiguity inherent in FM's virtually identical Policy as it relates to physical loss or damage caused by COVID-19.   FM's sister company, AFM, recognizing the language was not clear, strategized internally how to spin the ambiguity in its correspondence with policyholders.    The   evidence   also   shows   the   deliberate   "spin"

---

[4] Notice of Supplemental Evidence as filed in *Treasure Island* at ECF No. 243-1 at 2, attached as Exhibit 14.

[5] *Id*. at 3.

in which the FM Global insurers have been engaging surrounding COVID-19 coverage issues—seeking to find "wiggle room" in responding to COVID-19 claims.

### *The Policy's Coverage Against the "Risk of" the Pandemic*

57.     The Policy covers "physical loss or damage" to property, but also losses resulting from "all risks of physical loss or damage" to property.

58.     The undefined term "risks" in the Policy is defined by many dictionaries to mean "possibility."[6]

59.     The Policy insures against losses caused by "all risks," such as, the imminent threat or possibility of physical loss or damage to property, as well against losses after such physical loss or damage to property has occurred.

60.     FM elected to use this broad "all risks" language, *instead of* more restrictive policy language drafted in 2013 by the Insurance Services Office ("ISO"), the leading insurance industry drafting organization, and utilized by numerous insurers since then.  Most property policies written on post-2013 ISO forms have been at issue in COVID-19 coverage cases.  Those policies are responsible for many of the pro-insurer rulings that FM trumpets as being supposedly applicable to its far broader and far more costly coverage.

61.     This Policy is unique from the standard-form ISO policies involved in most COVID-19 coverage litigation because it includes different policy wording (most contain explicit and broad virus exclusions), different facts (most do not allege physical damage caused by the

---

[6] *See, e.g., Risk*, Merriam-Webster, www.merriam-webster.com/dictionary/risk ("[P]ossibility of loss or injury"); Risk, Collins Dictionary, www.collinsdictionary.com/us/dictionary/english/risk (synonymous with "danger, chance, threat, possibility"); Risk, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/risk ("[T]he possibility of something bad happening"); *Risk*, The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=risk ("The possibility of suffering harm or loss; danger.").

presence of COVID-19), and an explicit grant of coverage making communicable disease a covered cause of loss.

62.      The few cases concerning this Policy recognize its unique form and coverages. *See, e.g.*, *Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*, 2021 WL 1851030 (E.D. Tex. May 5, 2021) (denying FM's motion for judgment on the pleadings because this policy "is governed by different contract terms," "is much broader," and "expressly covers loss and damaged caused by 'communicable disease.'"); *Snoqualmie Entertainment Authority v. Affiliated FM Ins. Co.*, 2021 WL 4098938, at *2, *5 (Wash. Super. Sep. 03, 2021) (granting the policyholder's motion for partial summary judgment because the AFM policy provides "broad property and business interruption coverage" and "all risks of physical loss" includes the inability "to physically use, operate, or manipulate its properties.").

63.      The result is that, unlike most COVID-19 insurance coverage cases, courts evaluating the broader coverage provided by FM's high-end policy form, find a plausible claim for relief, and either deny that this Policy's exclusions apply or find that an ambiguity requires further factual investigation. *See Live Nation Ent., Inc. v. Factory Mut. Ins. Co.*, 2022 WL 390712, at *7 (C.D. Cal. Feb. 3, 2022) (denying FM's motion for partial judgment on the pleadings because the "Complaint sufficiently alleges that COVID-19 caused physical damage that would be covered by the provisions of the Policy pertaining to physical loss and damage. Thus, on its face, the Contamination Exclusion does not exclude physical damage caused by COVID-19."); *Regents v. Factory Mutual Insurance Company*, Case No. 21-CV-30206 (D. Colo. January 26, 2022) (denying FM's motion for partial judgment on the pleadings because "a more developed record is required to determine whether [the insured's] alleged losses are covered or excluded by the Policy."); *Rowan Univ. v. Factory Mut. Ins.*, No. GLO-L-000250-21, (N.J. Super. Ct. Law Div.

Jan. 24, 2022) (denying FM's motion to dismiss because the plaintiff alleged physical loss or damage, and that COVID-19 is a physical substance resulting in a cycle of infection); *Thor Equities, LLC v. Factory Mut. Ins. Co.*, 531 F. Supp. 3d 802, 810 (S.D.N.Y. 2021) (denying FM's motion for judgment on the pleadings because it cannot be determined that the contamination exclusion "unambiguously forecloses recovery on [the insured's] losses due to contamination"). FM cannot hide behind rulings based on other facts, other law, and other policies.

64.     ISO's standard "Businessowners Coverage Form," prior to 2013, defined "Covered Causes of Loss" as "[r]isks of direct physical loss unless the loss is . . . [e]xcluded . . . or [l]imited[.]"  Exhibit 15 at 2.  In 2013, ISO issued revised Businessowners Coverage Forms that redefined "Covered Causes of Loss," by removing the term "risks of."  ISO now defines "Covered Causes of Loss" as "[d]irect physical loss unless the loss is excluded or limited[.]"  Exhibit 16 at 2. In support, ISO issued an "Important Notice to Policyholders" that insurers could send to their insureds to explain the changes in policy wording of the form that stated that "the term 'risk of' is removed from the Covered Causes of Loss provision."  Exhibit 17 at 3.

65.     Insurers therefore have had the opportunity, since at least 2013, to incorporate (and many have incorporated) an insuring agreement that deletes any reference to covering losses created by the "risks of" insured perils.  For example, Cincinnati Insurance Company, in revising its standard property policy form number FM 101, issued its own "Notice to Policyholders" in 2016 stating, "As ISO has done in reaction to court decisions, we are deleting the word 'Risks' from the preamble to the Covered Causes of Loss section of FM 101."  Exhibit 18 at 2.

66.     The court decisions issued in the years preceding ISO's revision of its Businessowners Coverage Form included *401 Fourth St., Inc. v. Inv'rs. Ins. Grp.*, 879 A.2d 166, 169-70 (Pa. 2005) (policy language covering "risks of" direct physical loss involving collapse, by

its terms, contemplates broader coverage than language simply employing the term "collapse."),

and *Customized Distribution Servs. v. Zurich Ins. Co*., 862 A.2d 560, 565 (N.J. Super. Ct. App.

Div. 2004) ("[T]he term 'risk' in the provision 'RISK[] OF DIRECT, PHYSICAL LOSS' supports

the view that the policy does not require that there be any actual physical damage to or alteration

of the material composition of the property.").  ISO's revision was intended, at least in part, to

foreclose the applicability to its policy from decisions such as these.

      67.    Long before the Pandemic, Donald S. Malecki, an insurance expert, who spent 48

years in the insurance and risk management consulting business, published an article in Risk

Management magazine stating that an insurance buyer may understand the phrase "risks of direct

physical loss or damage" to mean a *threat of* damage, citing *Customized Distribution* and similar

cases.  Exhibit 19 at 3.

      68.    Malecki concluded:

> Considering cases like these, where courts hold that 'risks of direct physical loss or damage' or 'risks of physical loss or damage' do not require that there be any actual physical damage but simply the threat of damage, there soon may be the impetus for some subtle policy changes.  Instead of referring to 'risks of direct physical loss,' it may be better for insurers to amend their policies to state that that coverage applies to direct physical loss or damage to covered property from a covered cause (or all covered causes), not hereinafter excluded or limited.  (*Some insurers have already taken similar precautions, with some even going so far as to avoid reference to 'physical loss or damage' because of its potential for ambiguity*.)

*Id*. (emphasis added).

      69.    Despite ISO's actions and warnings, the Malecki article, and court decisions, FM

continued selling property policies containing the term "risks of" in their insuring agreements.

This is broader coverage than afforded under the ISO form, and undoubtedly commands a higher

premium.  As is pertinent here, Mars faced the imminent "risk of" physical loss or damage to its

property covered by the Policy because of COVID-19 and/or the Pandemic.  FM's use of the term "risks of" abrogates any need for Mars to prove, as a condition of coverage, the actual presence of COVID-19 on its premises.  This is the case even though COVID-19 has been present at Mars locations.

**_The Policy's "Additional Coverages" and Coverage Extensions for "Communicable Disease"_**

70.     The Policy provides many different coverages.  They are mutually exclusive *only* where the Policy does so explicitly.  Where FM intended a coverage extension to be the *sole available coverage* for a particular type of loss, it expressly identified this limitation.

71.     For example, the Policy includes "Terrorism" as an "Additional Coverage."  In that coverage grant, it states that the "Amounts recoverable under this coverage are *excluded from coverage elsewhere in this Policy*."  *See, e.g.*, Exhibit 1 at 37 (emphasis added).  That is not the case, however, with the "Additional Coverages" or "Coverage Extensions" for "communicable disease."  The Policy does not state that these coverages are the *only* coverages under the Policy that respond to communicable disease at property, or that "amounts recoverable under this coverage are excluded from coverage elsewhere in this Policy."

**_FM's Contamination Exclusion_**

72.     FM contends in coverage litigation pending nationwide that the Policy's "contamination" exclusion precludes coverage for COVID-19 related claims, that the exclusion applies to communicable disease that involves actual or threatened physical loss or damage, *but* that the sub-limited Communicable Disease Coverages nevertheless cover the loss.  Those Communicable Disease coverages, according to FM, are exempted from the exclusion even though "communicable disease" otherwise triggers the exclusion.  This is circular reasoning and contrary to the policy language.

73.     In reality, the contamination exclusion cannot *exclude* communicable disease because the Policy explicitly *covers* communicable disease.  If "communicable disease" is within the definition of "contamination" in the Policy, then the sub-limited communicable disease coverages would be worthless because the coverage would be excluded.  Insurance policies are not construed to render bargained-for coverages worthless.

74.     As noted above, when the contamination exclusion refers to a substance excluded elsewhere in the Policy, it says so explicitly.  For example, the contamination exclusion says that "[t]his exclusion [] does not apply to radioactive contamination which is excluded elsewhere in this Policy."  Exhibit 1 at 18.  There is no comparable statement in the contamination exclusion concerning "communicable disease."

75.     Further, when FM intended to "except" a certain type of coverage, or coverage extension, from an exclusion, it also said so explicitly.  *See, e.g*., Coverage for "Off Premises Data Services Time Element" stating that "Coverage provided in this Extension is excluded from coverage elsewhere in this Policy."  *Id*. at 52.  There is no comparable statement in the communicable disease coverage extensions.

76.     Additionally, the contamination exclusion applies to "contamination, and any cost due to contamination."  *Id*. at 18.  Mars does not seek recovery from FM for "contamination" or "any cost due to contamination."

77.     FM focuses on the word "virus" in the contamination exclusion and asserts that, because SARS-CoV-2 is a virus, pathogen and/or disease causing or illness causing agent, it constitutes contamination which is excluded under its Policy.  This is incorrect.

78.     The Policy contains a definition of "communicable disease," defined as "disease which is":

19

    A.  transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges,

    B.  Legionellosis, or

    C.  transmissible from domesticated animal to domesticated animal by direct or indirect contact with an affected animal or the animal's discharges.

*Id*. at 74.

79.    The term "communicable disease" is not included in the Policy's definition of "contamination."  While FM's "contamination" definition includes the terms "pathogen," "pathogenic organism," "virus," and "disease causing or illness causing agent," it did not use either of those terms in its definition of "communicable disease."  *Id*.

80.    The only reasonable interpretation of the term "virus" and related terms in FM's contamination exclusion that gives meaning to all coverages, including the Communicable Disease coverages, involves traditional environmental pollution, not "communicable diseases" that are "[t]ransmissable from human to human by direct or indirect contact with an affected individual or the individual's discharges."  *Id*.

81.    To the extent COVID-19 was/is present or at risk of being present at Mars' insured locations or within five miles of its locations, its presence would be the result of a natural process in contrast to conduct or actions causing pollution or environmental contamination.

82.    If FM intended to exclude losses resulting from a pandemic or human-transmitted disease, it should have used a separate, clear exclusion in its Policy for such losses.  "Pandemic" exclusions have been included in some policies, but not here.

83.    Moreover, other insurers adopted ISO's standard-form exclusion titled "Exclusion Of Loss Due To Virus Or Bacteria" (ISO form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).  Exhibit 20.  The purpose of this language was to protect those insurers that chose

to use it from coverage for loss or damage resulting from infectious material and a pandemic.  FM chose not to include the ISO "virus" or other pandemic exclusion in the Policy.

## COVID-19 AND THE PANDEMIC

84.     In December 2019, the first instance of a respiratory illness caused by a novel coronavirus was identified in Wuhan, China.  The next month, the first case of COVID-19 was reported in the United States.

85.     On February 11, 2020, the International Committee on Taxonomy of Viruses announced "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" (the "Coronavirus") as the name of the new virus.  The World Health Organization ("WHO") announced "COVID-19" as the name of the disease caused by the Coronavirus.

86.     On March 11, 2020, the WHO declared the COVID-19 outbreak a global pandemic and noted that it was "deeply concerned [] by the alarming levels of spread and severity [of COVID-19]."[7]

87.     COVID-19 rapidly spread and continues to spread throughout the United States and worldwide.  It is present in fluid particles in the air, as well as on surfaces (e.g., walls, furniture, doors, fixtures, countertops and touch screens).  It is highly contagious and easily transmitted from person to person, from airspace to person, or from surface to person.

---

[7] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

88.     At the beginning of the Pandemic, the primary method of transmission was considered to be "fomite" or surface transmission—*i.e.*, transmission from one person to a surface, and then to another person.[8]

89.     That assumption caused some people to erroneously believe that COVID-19 could be eliminated simply by sanitizing an affected surface. More accurate and multi-faceted *quantitative studies*, however, disagree with those non-scientific assumptions.  In 2021, the CDC concluded that "surface disinfection once- or twice-per-day had little impact on reducing estimated risks" of Coronavirus transmission.[9]  Studies found that the Coronavirus "was much more resilient to [] cleaning than most other respiratory viruses."[10]  A 2021 study by the largest integrated health care system in New York State indicated that "droplet precautions, HEPA air filters, and contact safeguards may not sufficiently mitigate the spread of SARS-CoV-2" and concluded that "[i]t is increasingly apparent that the three arms of SARS-CoV-2 dissemination—direct-contact transmission, droplet-containing virions, and aerosolized-viral particles—must all be targeted to effectively control the continued spread of SARS-CoV-2 infection.[11]  In other words, the old Clorox wipes "cleaning" strategy is not sufficient and is at odds with science. The recent consensus among the CDC, the WHO, and researchers is that a predominant mode of Coronavirus and/or

---

[8] P. Rusin, S. Maxwell, & C. Gerba, *Comparative Surface-to-hand and Fingertip-to-mouth Transfer Efficiency of Gram-positive Bacteria, Gram-negative Bacteria, and Phage*, 93 J. APPLIED MICROBIOLOGY 4, 585-92 (Sept. 18, 2002).

[9] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021) (citing A. K. Pitol & T. R. Julian, *Community Transmission of SARS-CoV-2 by Fomites: Risks and Risk Reduction Strategies*, ENV'T SCI. & TECH. LETTERS (2020)), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.

[10] Nevio Cimolai, *Environmental and Decontamination Issues for Human Coronaviruses and Their Potential Surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020).

[11] Zarina Brune *et al*., *Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (Mar. 3, 2021).

COVID-19 transmission is through air, transforming the material content of the air, a problem that is especially acute in indoor or enclosed environments such as Mars' covered locations.[12] Scientists "suggest that the rapid growth in our understanding of the mechanisms behind respiratory infection transmission should drive a paradigm shift in how we view and address the transmission of respiratory infections to protect against unnecessary suffering and economic losses."[13]   Scientists requested that authorities endorse precautions to mitigate airborne transmission, including increasing ventilation and avoiding recirculating potentially virus-laden air in buildings.[14]   The CDC and the WHO have since updated their guidance; studies and scientists:

> have demonstrated beyond any reasonable doubt that viruses are released during exhalation, talking, and coughing in microdroplets small enough to remain aloft in air and pose a risk of exposure at distances beyond 1-2 m from an infected individual.[15]

90.    Industrial workspaces, including those at Mars' covered locations, contain many non-porous material surfaces that are particularly hospitable to the persistence of SARS-CoV-2 shed by persons affected with COVID-19.

91.    Many businesses, such as Mars, had to physically reconfigure its layout and install physical safety features, such as partitions, ingress/egress signs, sanitizing stations, temperature check stations, and upgraded and improved ventilation systems, in order to mitigate physical loss

---

[12] Jason Gale, *Covid-19 Is Airborne, Scientists Say. Now Authorities Think So, Too*, Bloomberg (May 16, 2021), https://www.bloomberg.com/news/articles/2021-05-16/covid-is-airborne-scientists-say-now-authorities-think-so-too
[13] Lidia Morawska, *et al., A paradigm shift to combat indoor respiratory infection*, Science (May 14, 2021), https://science.sciencemag.org/content/372/6543/689
[14] Lidia Morawska & Donald K. Milton, *It is Time to Address Airborne Transmission of Coronavirus Disease 2019 (Covid-19)*, 71 CLINICAL INFECTIOUS DISEASES 9, 2311-13 (Dec. 3, 2020).
[15] *Id.*

and damage and in an effort to restore the use of physical premises to the condition it was before the loss.

92.    The physical effects of COVID-19 and/or the Pandemic are not determined by simply glancing at the air, a door handle or a light switch and deciding that they look undamaged. Instead, those physical effects are established through factual and expert investigation, studies, and evidence, including through testimony by experts in the field of, for example, epidemiology, virology, and transmissible diseases (to establish presence through quantification, contact tracing, and other testing) and industrial hygiene (to establish that once present COVID-19 propagates through the property in the form of discharges, requiring testing, removal, repair, replacement, reconfiguration, and remodeling of property and other restoration activities).

93.    This is like the circumstances discussed in pre-Pandemic case law where courts routinely found that the infiltration of property by noxious substances – carbon monoxide, asbestos fibers, gasoline odors, ammonia, drywall gas, smoke, etc. – could qualify as covered "physical loss or damage." Physical effects are established through factual and expert investigation, studies, and evidence, including through testimony by experts in the field of, for example, epidemiology, virology, transmissible diseases, and industrial hygiene.

94.    Indeed, experts have opined in other COVID-19 cases in which FM Global companies are parties as to the mechanisms by which such physical loss and damage occurs.  In *Treasure Island*, the insured's virology expert, Dr. Angela Rasmussen, opined that:

> A.  "COVID-19 is a communicable disease that impacts and physically damages [insured]'s property in the following way: persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces at [insured's location].  This results in tangible, demonstrable, and detectable physical alternation and

transformation to the air and surfaces rendering them dangerous transmission vehicles for the potentially deadly disease."[16]

B. "The impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property. Because COVID-19 is an infectious viral disease that can be transmitted to susceptible people, it causes additive, sustained property damage. A substantial amount of transmission is prior to onset of clinical symptoms, which makes it difficult to detect. Due to the size of the property at [insured's location], cleaning and disinfection alone are insufficient to remediate the damage."[17]

95.    The same insured's epidemiology and industrial hygiene expert, Dr. Alex LeBeau, opined that: "Individuals with COVID-19 at [insured's location] altered the physical characteristics of surfaces and the air of occupied spaces at the location and at facilities in the vicinity with respiratory secretions and aerosols. As a result, the surfaces and air of occupied spaces at [insured's location] became vehicles for COVID-19 transmission."

96.    The physical loss and damage to property caused by persons with COVID-19 is not limited to the duration that infection from a single source remains present.  A recurrent cycle of infection via the air, infectious surfaces, and contact between an infected person and others will result in sustained physical loss or damage to property.  Mere cleaning and disinfecting of the air and surfaces of property does not repair or remediate the physical loss or damage to property caused by COVID-19.  There is no material difference in this respect between the property damage at Mars' covered properties and the property damage described by Dr. Rasmussen and Dr. LeBeau.

---

[16] Expert Report of Angela L. Rasmussen as filed in *Treasure Island* at ECF No. 205-2 at 4, attached as Exhibit 21.

[17] *Id.*

*Specific Physical Loss or Damage to Property Caused by the COVID-19 Pandemic at Mars'
Businesses and Mars' Responses to Recover and Restore Business Operations*

97.     Mars' recoverable losses will be subject to expert analysis and testimony based on the recovery methodologies described in the Policy, most particularly the lost Gross Profits or lost Gross Earnings calculations.

98.     Among other things, the COVID-19 communicable disease had been identified to be present at several covered Mars' locations because infected persons entered the premises, thus causing the shut-down of the business.

99.     Mars also incurred expenses at other sites where the COVID-19 communicable disease had been identified to be present because infected persons entered the premises.

100.    Mars' extra expenses include the cost of Personal Protective Equipment (*e.g.,* masks, shields, gloves), physical modifications to facilities (e.g., shields), disinfectants and anti-fog treatments, extra cleaning services, extra security services, decontamination, and plant costs incurred during shut-downs.

101.    Many Mars' facilities in the United States and abroad were shut-down, thus curtailing access, following issuance of civil authority shelter-in-place orders because, among other things, the actual presence of the COVID-19 communicable disease within five miles of covered Mars' locations was causing loss or damage to property.  The dates and locations are alleged upon information and belief and will be verified at a later time.

102.    Various Mars' facilities were partially shut down due to access restrictions of civil authority orders in light of the actual presence of the COVID-19 communicable disease.

103.    Several other Mars' facilities operated at reduced capacities during the pertinent time period.

104.    In sum, as a consequence of the global COVID-19 pandemic, Mars has undertaken the following activities at its facilities at substantial cost:

a.   **Remediating or Replacing Physical Property Adversely Altered**: Remediation and/or disposal and/or replacement of personal property and real property that had been physically contacted and adversely altered by respiratory particles, phlegm, and other materials expelled by persons with COVID-19;

b.   **Business Shutdowns Due to COVID-19 Being Present at a Location:** Shut down of facilities and remedial efforts, as is common and necessary when disease outbreaks occur at a facility;

c.   **Time Element Losses Due to the COVID-19 Being in the Community (Even if *Not* at the Business Location):** Suspension of business activities due to business premises being rendered unreasonably dangerous for any or full occupancy and unfit for their ordinary or intended purposes (even in cases in which COVID-19 was not actually present nor suspected to be present at the business location), due to pandemic conditions and the threat posed by COVID-19 in general geographic proximity (*i.e.,* within five miles) of the business location;

d.   **Extra Expenses to Remain Operational Even With COVID-19 at the Business Location:** Undertaking out-of-the-ordinary activities and expenses, such as testing, protective equipment, reconfiguration of work spaces for social distancing, reduced or staggered schedules, facilitation of remote work, etc., in order to continue operations at a business location or at replacement locations and to mitigate the effects of shutdowns or slowdowns caused by the actual presence of COVID-19 at a facility;

e.   **Extra Expenses and Expediting Costs to Remain Operational Even With COVID-19 Being in the Community (Even if Not at the Business Location):** Undertaking out-of-the-ordinary activities and expenses, such as testing, protective equipment, reconfiguration of work spaces for social distancing, reduced or staggered schedules, facilitation of remote work, etc., in order to render business premises safe for occupancy and fit for their ordinary purpose or intended purposes (even in cases in which COVID-19 was neither actually present nor suspected to be present at the business location), due to pandemic conditions and the threat posed by COVID-19 in geographic proximity to the business location spreading to the insured location;

f.   **Logistics Costs:** Addressing the disruption of the normal movement of goods and materials between business locations and/or vendor or customer locations; and

27

g. **Claims Preparation Costs:** Retention of outside financial and operational experts and the cost of using Mars' employees to document and calculate losses arising from COVID-19.

### THE FM POLICY APPLIES TO MARS' LOSSES

105.    The risk of and actual spread of COVID-19 causes physical loss and damage to property, and the Policy includes no exclusion that would preclude coverage for such risks of loss and damage to covered property.

106.    The Policy provides for "Time Element Coverage" loss as a direct result of physical loss or damage of the type insured to covered Property during the "Period of Liability." Mars' claim consists of "basic" Time Element Coverage and Extra Expense, as well as various "extensions" of that coverage including, without limitation, "Civil or Military Authority," "Ingress/Egress," "Logistics Extra Cost," "Attraction Property," and "Interruption by Communicable Disease." Mars incorporates, in full, the wordings of each of these coverages by reference.

107.    Nothing in the Policy requires a total cessation of business for Mars to recover Business Interruption Coverage losses. Mars limited or ceased its operations at covered locations because of the presence of COVID-19 and/or the imminent "risk" that COVID-19 would cause physical loss or damage to property. It also suffered civil or military authority, ingress/egress, logistics extra cost, and attraction property losses, as well. None of these required physical loss or damage to Mars' covered properties.

108.    Mars experienced both direct physical loss and damage.

109.    Mars's insured locations suffered direct physical loss when they were deemed uninhabitable, inaccessible, nonfunctional, and dangerous to use because of the high risk for spreading COVID-19. Such physical loss is comparable to asbestos, carbon monoxide, ammonia,

28

odor from methamphetamine lab, or toxic gasses from drywall or other intangible non-structural sources, all of which render properties uninhabitable, inaccessible, and dangerous to use and which courts hold constitute direct physical loss under "all risk" property policies.  *See Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 376 (E.D. Va. 2020) (finding that COVID-19 is "similar" to "those where courts found that asbestos, ammonia, odor from methamphetamine lab, or toxic gasses from drywall, which caused properties uninhabitable, inaccessible, and dangerous to use, constituted a direct physical loss."); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010) (finding under Virginia law that an insured's residence sustained "direct physical loss" within the meaning of a homeowners policy when toxic gases rendered it uninhabitable by drywall manufactured in China even though the drywall was still intact); *US Airways, Inc. v. Commonwealth Ins. Co.*, 2004 WL 1094684, at *5 (Va. Cir. Ct. May 14, 2004) (holding FAA order grounding flights at Reagan National Airport could constitute direct physical loss when "nothing in the Policy . . . requires that [there] be damage to [the insured's] property.").

110.    Mars's insured locations also suffered direct physical damage, including tangible, demonstrable, and detectable physical alteration and transformation to the air and surfaces at Mars' covered property, and at third-party property within a designated radius of Mars' covered property rendering them dangerous transmission vehicles for the potentially deadly COVID-19 communicable disease, as supported by scientific data.

## COUNT I
## Declaratory Relief

111.    Mars repeats and realleges the allegations in the preceding paragraphs, in full, by reference.

112.     As detailed above, actual controversies exist between Mars and FM on many factual and legal issues that are integral to Mars' ability to recover the full amount of its covered COVID-19 losses. Mars therefore seeks, without limitation, the following declarations from the Court so that the parties can ascertain their rights and obligations under the Policy and potentially resolve their disputes:

a. As a matter of scientific fact, COVID-19 physically impacted and damaged Mars' covered property, and third-party property within a designated radius of Mars' covered property;

b. As a matter of scientific fact, persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces at Mars' covered property and third-party property within a designated radius of Mars' covered property;

c. As a matter of scientific fact, the process described in the preceding paragraphs 112(a)-(b) resulted in tangible, demonstrable, and detectable physical alteration and transformation to the air and surfaces at Mars' covered property, and at third-party property within a designated radius of Mars' covered property, rendering them dangerous transmission vehicles for the potentially deadly COVID-19 communicable disease;

d. As a matter of scientific fact, the impact and physical damage caused on-site by persons with COVID-19 is not temporary and is sustained through any occupation of the affected property;

e. As a matter of scientific fact, the infectious viral, communicable COVID-19 disease causes additive, sustained property damage because of its easy transmissibility between persons;

f. As a matter of scientific fact, a substantial amount of COVID-19 transmission is prior to onset of clinical symptoms, which makes it difficult to detect.

g. As a matter of scientific fact, the sizes of Mars' covered properties, and the sizes of third-party properties within a designated radius of Mars' covered property, render cleaning by Clorox wipes, Lysol, chlorine bleach, etc., insufficient to remediate the loss or damage;

h. As a matter of scientific fact, persons with COVID-19 at Mars' covered locations, and at relevant third-party property, altered the physical characteristics of surfaces and the air of occupied spaces at these locations with respiratory secretions and aerosols, and, as a result, the surfaces and air of occupied spaces at Mars' covered

properties, and at relevant third-party property, became vehicles for COVID-19 transmission;

i.  The scientific processes described in the preceding paragraphs 112(a)-(h) qualify as the "risk" of direct physical loss or damage to property;

j.  The scientific processes described in the preceding paragraphs 112(a)-(h) qualify as direct physical loss or damage to property;

k.  Mars has suffered "physical loss or damage" to covered property;

l.  Mars has suffered a loss as a result of "physical loss or damage" to relevant third-party property;

m.  The scientific processes described in the preceding paragraphs 112(a)-(h) entitle Mars to recover its losses under *each* applicable coverage part – e.g., business interruption/time element, gross earnings, gross profits, extra expense, civil or military authority, contingent time element, ingress/egress, attraction property, logistics extra costs, claims preparation costs, and communicable disease response and interruption by communicable disease – and not just the sub-limited coverage to which FM points;

n.  The COVID-19 communicable disease is not a contaminant as that term is defined in the Policy;

o.  The contamination exclusion in the Policy does not apply because Mars does not seek to recover for contamination or any cost due to contamination;

p.  The contamination exclusion in the Policy does not apply because it would swallow coverage otherwise afforded under the Policy;

q.  The contamination exclusion in the Policy does not apply because Mars does not seek recovery for the type of environmental contamination to which it is aimed;

r.  The contamination exclusion in the Policy does not apply considering, at the very least, the scientific processes described in the preceding paragraphs 112(a)-(h) above; and

s.  The loss of use or loss of market exclusion in the Policy does not apply considering, at the very least, the scientific processes described in the preceding paragraphs 112(a)-(h) above.

113.    The Court's resolution of the issues described in paragraph 112 will resolve the actual controversies between the parties, obviate the need for serial litigation over difficult issues of fact and law and potentially assist the parties in resolving their disputes.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Mars prays for judgment against FM as follows:

A.  For the declarations described in paragraph 112;

B.  The costs of suit incurred; and

C.  Any other relief that the Court deems just and proper.


Dated:  June 1, 2022                              Respectfully submitted,

                                                 /s/ Teri J. Diaz
                                                 Teri J. Diaz (VSB No. 87457)
                                                 Paul A. Zevnik (*pro hac vice* forthcoming)
                                                 MORGAN, LEWIS & BOCKIUS LLP
                                                 1111 Pennsylvania Avenue, N.W.
                                                 Washington, D.C. 20004
                                                 Tel: 202.739.3000
                                                 Fax: 202.739.3001
                                                 teri.diaz@morganlewis.com
                                                 paul.zevnik@morganlewis.com

                                                 *Attorneys for Plaintiff*